UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-22906-CIV-COOKE/GOODMAN

BARBARA HOOVER,

     Plaintiff,

v.

NCL (BAHAMAS) LTD.,

     Defendant.

_____/

### ORDER ON PLAINTIFF'S SPOLIATION SANCTIONS MOTION

Barbara Hoover was a passenger on the *Bliss*, a cruise ship operated by Defendant NCL (BAHAMAS) Ltd. On August 7, 2018, she slipped while walking down an outdoor stairway leading from one deck to another, sustaining injuries. After the cruise, Hoover was in contact with NCL's claims division about her fall and injuries. During those communications, Hoover did not ask NCL to preserve the stairway and she did not seek an inspection. She later retained counsel, who, on July 12, 2019, and without sending a demand letter, filed this lawsuit.

Hoover's counsel later served a request to inspect the vessel (in general) and the stairs (specifically). Hoover's attorney retained an expert to examine the stairs, but NCL had placed black, anti-slip strips on the edge of the stairs in December 2018 (more than

six months before the lawsuit was filed). NCL had also by then added grooves into the stairs, but it advised the Court that an extensive search for information and documents did not provide a precise date on which the grooves were added.

Hoover contends that her expert was unable to adequately inspect the stairs because of the anti-slip strips and grooves. NCL points out that Hoover's expert never asked for the strips to be removed and that video surveillance footage of Hoover's fall demonstrates that she did not fall on the part of the steps which now contain grooves.

Hoover filed a motion for spoliation sanctions. [ECF No. 64]. The motion claims that NCL's alterations to the stairs were not subsequent remedial measures. Instead, she claims, the installation of the strips and grooves were "indicative of NCL's strategy to prevent the Plaintiff from obtaining evidence in this case." *Id.* at p. 18. She argues that the alterations "cannot be credibly explained as not involving bad faith." *Id.*

Hoover's spoliation sanctions motion is also based on a claim that NCL purportedly destroyed "numerous communications" concerning the "building, approving and/or inspecting [of] the subject staircase," a conclusion she reaches because, she says, "it is illogical in this highly technical world that NCL would not have any of the documents." *Id.* at pp. 2, 17.

Hoover seeks a default judgment against NCL or, in the alternative, (a) a ruling that NCL approved, created, or participated in the design of the staircase; or (b) an adverse inference jury instruction allowing the jury to infer from the non-existence of the

emails that the emails would be unfavorable to NCL if they still existed. Moreover, Hoover seeks *all* of the following as **additional** relief if a default judgment is not entered against NCL: (1) an order establishing the element of notice is established as a consequence for "failing to preserve the staircase," (2) an adverse inference jury instruction allowing the jury to infer from the "material alterations of the staircase" that it would be unfavorable to NCL if the staircase still existed in the condition it was in when Hoover slipped, (3) an order striking NCL's affirmative defenses, (4) a jury instruction explaining that NCL made alterations to the stairs before the jury is shown a photograph of the stairway in its present condition, and (5) an order requiring NCL to produce all documents (whether privileged or otherwise) generated as a result of the investigation.

NCL filed an opposition response to the spoliation sanctions motion and also filed a notice of supplemental authority for a recent, published Eleventh Circuit opinion, *Tesoriero v. Carnival Corp.*, ___F.3d___, No. 18-11639, 2020 WL 3969265 (11th Cir. July 14, 2020). [ECF Nos. 83; 88]. United States District Judge Marcia G. Cooke referred the sanctions motion to me. [ECF No. 9]. The Undersigned held a 2.5-hour hearing on the sanctions motion (and other discovery issues) and the parties filed Court-ordered, post-hearing submissions. [ECF Nos. 92; 94].

Although NCL indisputably anticipated litigation before it repaired the stairs, this alone is insufficient to justify spoliation sanctions. Because Hoover has not established bad faith by NCL concerning its stair repairs and has not shown significant impairment

in her ability to prove her lawsuit, Hoover is not entitled to any sanctions under the Court's inherent authority for NCL's alterations to the steps. The Undersigned therefore **denies** the sanctions motion as it relates to the stair repairs or remediation.

Concerning the purportedly destroyed or discarded email communications relating to the design of the stairway, Hoover has not established all the elements required by Federal Rule of Civil Procedure 37(e), which governs claims for failure to preserve electronically stored information ("ESI"). Hoover has not proven that NCL had responsive ESI in its possession in the first place, that it had a duty to preserve the emails (assuming they were in NCL's possession) before she fell on the ship, that NCL had responsive ESI after Hoover fell, that NCL failed to take reasonable steps to preserve the ESI (again, assuming it existed), or had an intent to deprive her of the evidence. The Undersigned therefore also **denies** the sanctions motion as it relates to the purportedly destroyed emails. [1]

---

[1]   The Undersigned is authorized to enter an Order, as opposed to a Report and Recommendations. *See Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995) ("Even [where] a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction," then the order is treated as not dispositive under Federal Rule of Civil Procedure 72(a)); *see also QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 767, 683 n.2 (S.D. Fla. 2012) (explaining that magistrate judge has authority to enter a sanctions order, as opposed to a report and recommendations, when sanctions are denied); *Taverna Imports, Inc. v. A & M Wine & Spirits, Inc.*, No. 15-24198-CIV, 2018 WL 3611405, at *10 (S.D. Fla. July 27, 2018) (explaining that magistrate judge has authority to enter a sanctions order, as opposed to a report and recommendations, when sanctions are denied).

However, the Undersigned requires NCL to produce to Hoover one (and perhaps more) of the work product photographs of the stairs. This result is not a sanction for bad faith misconduct or for violating Rule 37, as the Undersigned has not found that NCL acted in bad faith. Instead, this ruling is based on the Rule 26-based exception to the work product doctrine (i.e., Hoover has a substantial need for the photographs and cannot, without undue hardship, obtain their substantial equivalent by other means). Hoover would have been entitled to these work product photographs as a consequence of the stairway repairs even if she had not filed a sanctions motion. NCL must produce these photographs within five business days.[2]

---

[2]     NCL's description of the photographs in its interrogatory answers make it difficult for the Undersigned to discern how many photographs depict the stairs before the repairs/alterations were made. *See* ECF No. 32-12, p. 6 (Interrogatory No. 7). It seems as though at least one of the photographs is of the stairs on the day of the fall. But it also seems that six other photographs may also be of the stairs before the repairs, but it is equally possible that they were taken after the repairs/alterations were completed.

NCL's answer to Interrogatory No. 7 provides: "As it relates to the alleged incident, NCL's legal counsel is in possession of ten (10) photographs. Four (4) of the photographs were **taken during NCL's investigation** into the alleged incident: two (2) photographs depict the shoes Plaintiff was wearing at the time of the incident, one (1) photograph depicts Plaintiff's arm, and **one (1) depicts the subject staircase**. NCL's legal counsel is also in possession of six (6) photographs of the subject staircase which were taken as part of NCL's legal counsel's investigation." *Id.*

NCL's answer mentions two investigations -- one undertaken by NCL and one undertaken by its counsel. Thus, it appears that the NCL investigation took place the day of Hoover's fall, which means the photograph of the stairs would not contain the black anti-skid strips. Similarly, it seems as though counsel's investigation occurred after the lawsuit was filed, which means the photographs would show the anti-slip strips.

A more-detailed outline of the facts and applicable legal principles is provided below.

Although this ruling is in an order, the parties may, of course, still pursue objections. Under Rule 72(a), a party may object to a magistrate judge's decision of a non-dispositive matter. Fed. R. Civ. P. 72(a). "The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.*; *see also* 28 U.S.C. § 636(b)(1)(A). But this standard of review is "extremely deferential." *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co., Inc.*, No. 12-CV-81397-KAM, 2015 WL 11921411, at *1 (S.D. Fla. July 6, 2015). "A finding or recommendation is clearly erroneous if 'the reviewing court, after assessing the evidence in its entirety, is left with a definite and firm conviction that a mistake has been committed.'" *Blake v. Batmasian*, No. 15-81222-CIV, 2018 WL 3829803, at *2 (S.D. Fla. Aug. 9, 2018) (quoting *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1523 (11th Cir. 1997)).

Or as the Seventh Circuit has put it: "[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988). "The mere fact that a reviewing Court might have decided the issue differently is not sufficient to overturn a decision when there are

---

NCL must produce all photographs showing the stairs **before** the stairway in question was repaired or altered. I assume that only one photograph is in this category, but it might be as many as seven.

two permissible views of the issue." *Tolz v. Geico Gen. Ins. Co.*, No. 08-80663-CIV, 2010 WL 384745, at *2 (S.D. Fla. Jan. 27, 2010) (internal quotation omitted). "[T]he 'clear error' exception must be rarely invoked." *Cox Enters., Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1272 (11th Cir. 2015).

## I.   Factual Background

### a.   The Stairs

Hoover slipped while walking down the stairs between decks 16 and 17. NCL anticipated litigation as of the August 7, 2018 incident, as it asserted work product protection over incident reports generated the same day and photographs (at least one of which appears to have been taken the same day). Specifically, NCL asserted the work product doctrine over a four-page typed investigative report prepared by a security officer, a two-page surveillance report, a two-page handwritten security guard report prepared by a security guard, and ten photographs.

Hoover submitted a claim to NCL about her fall on August 21, 2018. On October 11, 2018, an NCL legal claims representative responded by email to Hoover, asking her to advise what she believed would be a fair resolution. The NCL legal claims representative also asked Hoover to give NCL a few additional days to finalize her claim.

On January 7, 2019, Hoover sent an email to the NCL legal claims representative advising that she had x-rays, an MRI, and a cortisone shot. She also advised that her doctor found a torn pronator muscle tendon and that she had started physical therapy.

She further told NCL that she needed surgery and that she could not continue physical therapy because her health insurance carrier only pays for 30 sessions a year and she needed to reserve the remaining 24 sessions for post-surgery sessions.

Later that day, the NCL claims representative then asked Hoover to advise when she would be having the surgery.

On February 7, 2019, Hoover sent NCL an email, advising of her January 30, 2019 surgery and the complications arising from it. Later that day, NCL sent a response email, acknowledging the surgery and asking for updates on Hoover's follow-up visit to the surgeon.

On March 15, 2019, Hoover provided another update. She advised that the healing was long and painful and that she was still unable to return to work or drive.

NCL's legal claim representative responded in a March 27, 2019 email and asked Hoover to provide her with the doctor's medical reports after she completed physical therapy and documentation of out-of-pocket or medical expenses.

As phrased by Hoover in her spoliation motion, "despite all of this communication, NCL *never* advised Hoover that it would be materially altering the steps of the staircase." [ECF No. 64, p. 8 (emphasis in original)].

Hoover filed the lawsuit on July 12, 2019. In an August 20, 2019 written discovery request, Hoover requested an inspection and made a preservation-of-evidence demand. [ECF No. 92-4]. The request noted that the inspection would be "for the purposes of

inspecting, measuring, photographing, videotaping, testing and/or sampling." *Id.* at p. 2.

Hoover's request for inspection also contained a "request to preserve," which provided

as follows:

> This shall also serve as a request to preserve in the condition it was in as of the date and time of the subject incident the following: any signage, floor materials, floor surface materials, floor cleaning and/or maintenance instrumentalities, danger, warning and/or caution signs, cones, lights, barricades, instrumentalities, products, and/or any other things involved in or which may have caused or contributed to the cause of the subject incident, and all of the video of the area taken on the day of the subject incident.

*Id.* at pp. 3-4.

Unbeknownst to Hoover, however, NCL had **already** made repairs to the steps in

question -- and had done so approximately eight months earlier, in December 2018. But

Hoover and NCL's counsel would not learn the specifics about the timing of these repairs

until July 2020. Even then, however, they would learn only about the timing of the anti-

slip strip installation. They would never learn when the grooves in the stairs were

installed.

On October 4, 2019, in response to interrogatories, NCL disclosed for the first time

that anti-abrasive strips "were added to the ends of each step on the subject staircase"

and that "additional grooves were also added to each step on the subject staircase." [ECF

No. 32-12, p. 12]. In addition, NCL's answer to Interrogatory No. 15 further explained

that "[t]he word 'CAUTION' was also added to the flooring at the base of the subject

staircase." *Id.*

According to Hoover's motion, the strips and grooves prevented both parties' experts from testing the coefficient of friction of the steps. It also asserted that the test would not be accurate even if the anti-slip strips could have been removed for the inspection "because the glue or adhesive used to attach them would alter the results." [ECF No. 64, p. 4].

NCL arranged for Hoover's expert, Dr. Srinivas Kadiyala, Ph.D., to inspect the subject staircase aboard the *Bliss* when it was in Port Canaveral, Florida, on December 30, 2019. Although Dr. Kadiyala did not examine the surface of the steps underneath the anti-skid coverings, he was still able to issue a report based on his conclusions and opinions. Dr. Kadiyala opined that "the root cause of the hazardous slip condition was the failure to provide uniform dimensions in the entire set of stairs for uniform gait in descent." [ECF No. 63-1, p. 28]. In addition, the following opinion was provided: "the proximate cause of Mrs. Hoover's slip and fall was the design irregularity in stair geometry and a failure to maintain a uniformly slip-resistant stairway walking surface under reasonably foreseeable conditions." *Id.* at p. 20.[3]

During a July 16, 2020 Zoom hearing on this spoliation motion, the Undersigned determined that neither party knew when NCL had made the repairs/alterations (i.e.,

---

[3]     NCL has moved to strike this expert. [ECF No. 63]. That still-pending motion has not been referred to me, but I note that the grounds for it are not that the expert was unable to inspect the surface under the anti-skid strips or did not perform a coefficient of friction test on that area of the step.

installing the black anti-slip strips and the gouges in the steps themselves) to the stairs in question aboard the *Bliss*. Because the analysis could very well differ if the repairs/alterations were made after NCL received counsel's preservation letter (as opposed to being completed before the inspection request/preservation demand was received), the Undersigned directed NCL to search its records again in an effort to pinpoint this information. [ECF No. 91].

NCL's response is an affidavit from an in-house attorney serving as Senior Director of Passenger and Crew Claims. [ECF No. 94]. The affidavit explains that a second probe located a document indicating that the strips were added in **December 2018**.[4] The affidavit explains that NCL could not identify the specific crewmember (or crewmembers) who installed the strips. No information was provided about when the grooves were made to the stairs themselves, and it is unclear whether the grooves were created on the same day as the strips were installed.

---

[4]     The affidavit explains that a December 17, 2108 note from a Shipboard Safety and Health Committee meeting included a crewmember indicating that the anti-slip strips were added to both the port and starboard stairs at some point within the "last two weeks." [ECF No. 94, p. 4]. Therefore, NCL estimates that the strips were installed during the first two and a half weeks of December 2018. December 2018 is many *months* before Hoover obtained counsel and many months before the lawsuit was filed and many months before NCL received an inspection request. Therefore, the lack of clarity about which *specific* day in the entire month of December 2018 the strips were installed on is, for all practical purposes, irrelevant.

   b.   The Allegedly Destroyed Documents (likely ESI)

In her Third Request for Production of Documents, Hoover asked (in Request No. 7) for documents "received from or through Independent Maritime Advisors [("IMA")] discussing the design, construction, inspection, and approval/rejection of the stairs at issue for the time period of 2014-2018 (i.e., when the ship was being built)." [ECF No. 59-2, p. 4]. Hoover says she asked for these because they relate to her negligent design claim. Hoover also propounded several related requests for communications to and from NCL involving the construction of the staircase.

In response, NCL advised that it did not possess any responsive materials. More specifically, it advised that, "after a diligent search," it does not possess any correspondence or documents between NCL and the shipyard and/or IMA about the subject staircase during the time the *Bliss* was being built. *Id.* It further advised that it had contacted IMA and asked whether IMA possessed any responsive documents, and it committed to producing the documents if IMA located them and provided them to NCL. NCL's response included an additional point: "Please note that Defendant is not legally required to obtain responsive documents from a third party such as IMA." *Id.*

According to NCL, IMA is a third-party company which NCL hired to oversee the design, construction, inspection, and approval of all specifics concerning the staircase in question from 2014 to 2018 (when the ship was being built). NCL further explained that, in response to an NCL request that it search for responsive documents, IMA provided

NCL with a shop drawing of the subject staircase, which NCL says it immediately produced to Hoover.

Hoover accuses NCL of destroying or concealing responsive documents. At bottom, Hoover says there "**should be** numerous responsive documents." [ECF No. 64, p. 16 (emphasis added)]. After all, she says, NCL's contract with the shipyard for construction of the *Bliss* requires all notices and communications to go to certain designated officials and a named supervisor. She concludes that it is "illogical" to think that the documents no longer exist "in this technological age." *Id.* at p. 8. Therefore, she asserts that NCL "engaged in the affirmative act of either deleting, destroying or concealing these communications." *Id.* at p. 17. In other words, this is her *theory*, based on the notion that the documents were in NCL's possession but were destroyed or concealed.

NCL brands the accusation as fundamentally incorrect, based on several mistaken assumptions.

First, NCL says that Hoover's primary theory of liability -- that NCL designed, constructed, and selected materials for the specific staircase at issue -- is erroneous. Although NCL says it had the ability to approve designs from a general perspective ("e.g., onboard location of the staircase and how it would look"), it delegated the more-specific decisions to the experts: the architects and builders. [ECF No. 83, p. 4]. NCL then retained IMA to "oversee design, construction, inspection and approval of all specifics related to the subject staircase during the ship's construction." *Id.* at p. 5.

Second, NCL emphasizes that "there is no language within the contract indicating that NCL would provide specific approval regarding dimensions, selected materials, or construction of the specific staircase at issue." *Id.* at pp. 6-7.

Third, it notes that the *Bliss* is a 1,094-foot passenger cruise ship, suggesting that it is not illogical for NCL to have not been involved in the precise decisions concerning the "dimensions, selected materials or construction of the specific staircase at issue" for such a large ship. *Id.* at p. 7.

Fourth, NCL submitted testimony from its corporate representative, explaining that it provides "a *vision* of what we want the ship to be and have" and that, "if anything, [the approval by NCL involved] perhaps just a birds-eye view of what the deck and what stairs are to look like." *Id.* at pp. 4, 32 (emphasis added).

Fifth, NCL says it "understands Plaintiff's **theoretical** argument that one specific staircase on the ship could have been the subject of discussion at some point during the five years that the ship was being built," but that it "has unfortunately been unable to locate" any communications. *Id.* at p. 7.

Sixth, NCL describes Hoover's position as "a fishing expedition for documents that are simply not available (assuming they existed in the first place)." *Id.* at p. 6.

Finally, NCL posits that Hoover has not established concealment of documents, "much less that NCL somehow acted in bad faith." *Id.* at p. 7.

## II.     Applicable Legal Principles and Analysis

Determining whether sanctions should be imposed against NCL depends on whether the missing items are ESI. That is because the standards for spoliation sanctions differ between common law principles and those found in Federal Rule of Civil Procedure 37(e), which governs the loss or destruction of ESI. *See Sosa v. Carnival Corp.,* No. 18-20957, 2019 WL 330865, at *1 (S.D. Fla. Jan. 25, 2019) (explaining distinctions).

Obviously, the stairs are not ESI, so they are analyzed with common law principles.

But the parties have not advised whether the purportedly destroyed documents are ESI. Assuming that NCL had such documents in its possession at one time, it is, of course, *theoretically* possible that the documents existed in a traditional, pre-internet format -- i.e., on old fashioned paper, stored in an actual filing cabinet. But it seems more likely that responsive documents, assuming they were ever in NCL's possession, were sent to and by NCL in emails, which would mean the documents are ESI.

As noted, no party has discussed the distinction between ESI documents and classic paper documents. Perhaps as a result of that omission, both sides discussed only common law spoliation standards, and neither side discussed Rule 37(e), which is used to assess potential sanctions involving lost ESI. Given this reality, the Undersigned will use common law principles to evaluate the sanctions demand for the alterations to the steps and will (in an abundance of caution) use *both* the common law and Rule 37 to assess

15

Hoover's sanctions demand for the supposedly missing documents.

  a. <u>Spoliation Sanctions Under Eleventh Circuit Common Law</u>

*Tesoriero* summarized many of the fundamental principles of spoliation sanctions jurisprudence in non-ESI cases, and they are listed below:

  1. "Spoliation is defined as the destruction of evidence or the significant and material alteration of a document or instrument." *Tesoriero*, 2020 WL 3969265, at *9 (internal citation omitted).

  2. "In some circumstances, a party's spoliation of critical evidence may warrant the imposition of sanctions." *Id.*

  3. When deciding whether to impose sanctions, several factors are relevant: "(1) whether the party seeking sanctions was prejudiced as a result of the destruction of evidence and whether any prejudice could be cured, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and (4) the potential for abuse if sanctions are not imposed." *Id.* (internal citation omitted).

  4. Spoliation sanctions, and adverse inferences in particular, "cannot be imposed for negligently losing or destroying evidence." *Id.* An adverse inference can be drawn only when the absence of evidence is predicated on bad faith. *Id.*

  5. In the context of spoliation, bad faith "generally means destruction for the purpose of hiding adverse evidence." *Id.*

  6. Negligence is insufficient to justify sanctions because it "does not sustain

an inference of consciousness of a weak case." *Id.* (internal citation omitted).

7.     Even if bad faith were shown, a decision to not impose sanctions would be appropriate "if the practical importance of the evidence was minimal." *Id.* (internal citation omitted). Thus, "evidence must be crucial to the movant being able to prove its prima facie case or defense to establish spoliation" and the ability to impose sanctions. *Id.* (internal citation omitted).

8.     "[B]ad faith can be established by circumstantial evidence only when the act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." *Id.* at *10 (internal citation omitted).

9.     Determining whether the spoliator was "fully aware" of a desire to inspect the evidence is a factor which is considered when determining whether the spoliator acted in bad faith. *Id.*

   b.   <u>Spoliation Sanctions Under Rule 37(e) For ESI</u>

Federal Rule of Civil Procedure 37(e) provides:

**(e) Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1)     upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2)     only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

The advisory committee's note to the 2015 amendment explains that the newly amended rule "forecloses reliance on inherent authority or state law to determine when certain measures would be used" for the loss of electronically stored information. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Rule 37(e) significantly limits a court's discretion to impose sanctions for ESI spoliations. As outlined in *In Re: Abilify (Aripiprazole) Products Liability Litigation*, it "authorizes courts to impose sanctions for destruction of ESI where <u>four conditions</u> are met." No. 3:16-md-2734, 2018 WL 4856767, at *2 (N.D. Fla. Oct. 5, 2018) (emphasis added).

First, as a preliminary matter, the rule applies only to ESI, so the first inquiry is whether ESI is what was lost. Assuming that the alleged spoliation does indeed involve ESI, then three additional questions must be resolved. First, should the spoliated ESI have been preserved in the anticipation or conduct of the litigation? Second, is the loss of the ESI due to the party's failure to take reasonable steps to preserve the ESI? Third, can the ESI be restored or replaced through additional discovery? Where the "[a]nswer to any of [the three] questions . . . is 'no,' . . . a motion for spoliation sanctions or curative measures must be denied." *Living Color Enters., Inc. v. New Era Aquaculture, Ltd*, No. 14-cv-62216,

2016 WL 1105297, at *4-5 (S.D. Fla. Mar. 22, 2016).[5]

The rule has two categories of relief: those in subsection (1) and the more-consequential ones in subsection (2). The sanctions available in subsection (2) require bad faith (i.e., the "intent to deprive"). But **both** categories of relief, including the "no greater than necessary to cure the prejudice" type in subsection (1), require that the preliminary four factors be established. The following points, all discussed in the Advisory Committee Notes, help inform the realistic, practical assessment of the third factor (i.e., whether the party "failed to take reasonable steps to preserve" the ESI).

Using the placement of issues discussed in the advisory committee's note to the 2015 amendment, the Court in *Williford* provides the following points to assist the analysis:

  1. The rule applies only to ESI and only when ESI is lost.

  2. "Perfection in preserving all relevant electronically stored information is often impossible."

  3. Similarly, the rule "recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection."

  4. The rule is "inapplicable when the loss of information occurs despite the party's reasonable steps to preserve."

---

[5] The *Living Color* Court deemed the first question listed above (does the loss involve **ESI**, as opposed to other types of evidence, such as traditional paper documents or objects like a ladder or car tire) to be a preliminary, threshold issue which, if answered affirmatively, triggers the *next* three questions. The Undersigned has designated this initial inquiry to be the first of four questions. But regardless of the numbering system, the Undersigned is assessing the same factors used in *Living Color*.

5.      "[I]nformation the party has preserved may be destroyed by events outside the party's control – the computer room may be flooded, a 'cloud' service may fail, a malign software attack may disrupt a storage system, and so on."

6.      If ESI information is lost because a party failed to take reasonable steps to preserve it, then "the initial focus should be on whether the lost information can be restored or replaced through additional discovery." If the information "is restored or replaced, no further measures should be taken."

7.      A court may resort to (e)(1) measures "only 'upon finding prejudice to another party from loss of the information.'"

8.      The rule "does not place a burden of proving or disproving prejudice on one party or the other."

9.      The more-stringent measures (deemed "specified and very severe") found in (e)(2) rejects cases which "authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence."

10.     "Negligent or even grossly negligent behavior" does not logically support the inference that lost evidence was "unfavorable to the party responsible for the loss or destruction of the evidence" because "information lost through negligence may have been favorable to either party, including the party that lost it."

11.     Subdivision (e)(2) "does not include a requirement that the court find prejudice to the party deprived of the information" because the required intent finding also supports "an inference that the opposing party was prejudiced by the loss of information that would have favored its position."

12.     Courts should use caution in using the (e)(2) measures. Finding the requisite intent does not require a court to adopt any of the (e)(2) measures. The "remedy should fit the wrong" and the "severe measures" should "not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss."

20

*Williford v. Carnival Corp.*, No. 17-21992, 2019 WL 2269155, at *5-6 (S.D. Fla. May 28, 2019) (citing Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment).

      c.  <u>The Stairs</u>

The threshold issue -- whether the stairs were destroyed or materially altered -- is not an easy question. The parties agree that Hoover slipped on the edge or nose of the step, not on the wooden step itself. The video of the incident confirms this. When Hoover slipped, the edge of the step was covered in metal. By the time her expert inspected it, the black, rubber-looking, anti-skid strips had been placed over the edges of the steps. So the stairs are still there, but the edges had been altered through the repairs.

For the sake of discussion, the Undersigned will assume that the stairs in question had been *materially* altered. The next critical question is whether NCL acted in bad faith. The Undersigned finds that it did not.

Hoover argues that NCL did act in bad faith, and she notes that NCL could have easily advised her of its intent to alter the stairs before it started the alteration. And she contends that NCL should have done this because it knew she was pursuing a claim and had been in contact with its claims department, albeit without counsel and with the apparent intent to resolve the claim through reimbursement of expenses and direct losses, rather than through a lawsuit filed by an attorney.

Although NCL *could* have postponed the repairs until it first notified Hoover about them and gave her time to inspect them and/or photograph them, its failure to do so does

not rise to the level of bad faith. Instead, the lack of contact with Hoover is, at most, negligent. This conclusion is bolstered by the reality of NCL's size and involvement with claims.

In 2018, when Hoover fell, NCL's Miami-based legal department was responsible for handling claims and lawsuit against NCL, Oceania Cruises, and Regent Seven Seas Cruises (the "Brand" or "Brands"). [ECF No. 99-1].[6]

In 2018, 26 ships were operated by all Brands; the number was 27 ships for 2019 (when Hoover was still communicating with NCL's in-house claims representative).

NCL's Miami-based legal department handles claims and litigation involving both passengers and crewmembers arising from incidents on Brand ships. The majority of crew claims are resolved through binding arbitration. The vast majority of passenger lawsuits are filed in Miami federal district court, though some passenger lawsuits involving Oceania and Regents ships have also been filed in courts in other countries. NCL's Miami-based legal department is responsible for handling all lawsuits filed worldwide.

At the Undersigned's direction [ECF No. 93], NCL filed a declaration [ECF No. 97] revealing the number of passenger claims it received each year from 2015 through 2019 and the number of those which ultimately led to litigation. NCL wanted to file the

---

[6]     Although this information is derived from a declaration which NCL filed under seal, this precise information is not the type which NCL deems so confidential that it must be referenced only in an under-seal submission.

declaration under seal because, it said, "statistics concerning the specific numbers of lawsuits and private arbitrations initiated by passengers and crewmembers (respectively) on a yearly basis is not currently in the public domain" and because "information concerning claims (for which lawsuits or arbitrations were not filed) is not available to the general public or media." [ECF No. 97, p. 2].

The Undersigned does not consider it necessary for purposes of this Order to reveal the specific number of claims or lawsuits or arbitrations which passengers and crewmembers have submitted to, or filed against, NCL. Instead, it is adequate to say that NCL's Miami-based legal department was monitoring a significant number of claims, lawsuits and arbitrations around the world in 2018 and 2019 -- and reviewing its files to determine if a repair or remediation somehow implicated a claim or lawsuit or arbitration would be a significant undertaking. Postponing repairs until the passenger or crewmember (or their attorneys) were contacted and given the opportunity to inspect the vessel, which might be at sea for extended periods of time or which might be traveling in a different part of the world, would also create a significant burden.

The no-bad-faith conclusion is further supported by Hoover's failure to request an inspection or to otherwise advise NCL that she had the desire to inspect the stairs or have an expert do so on her behalf. *Tesoriero* considered the plaintiff's failure to request that the item in question -- a broken chair -- be preserved or that she permitted to inspect it a substantial factor in its analysis of whether the cruise ship operator acted in bad faith

when it disposed of the chair. 2020 WL 3969265, at *10-11. In doing so, the Eleventh Circuit also distinguished a case where sanctions *were* imposed (*Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005)) by emphasizing that the defendant there was "fully aware" of the plaintiff's desire to inspect the vehicle. *Id.* at *10.

In the instant case, not only was NCL not "fully aware" of Hoover's desire to inspect the stairs until long after the repairs were made, but NCL was not even *partially* aware of Hoover's desire. In fact, it seems as though Hoover did not have the urge to inspect the stairs until she retained counsel, which was many months after the stairs were repaired.

Moreover, Hoover's theory that the NCL crew involved in installing the anti-slip strips months after Hoover fell should have first contacted NCL's Legal Department, which then should have concluded that no repairs be done because a claims representative had exchanged a few mails with Hoover about reimbursement of expenses, is too attenuated to generate a finding of bad faith by NCL. Indeed, as *Tesoriero* cogently and practically explained, "the right hand not talking to the left is not the same things as the right hand telling the left to destroy evidence." 2020 WL 3969265, at *11.

To borrow language used by *Tesoriero*, "nothing in the record smacks of bad faith," and NCL's explanation "reasonably suggests that the [stairs were] not destroyed to hide adverse evidence." *Id.*

Hoover's failure to ask that the stairway be preserved and not altered until after

24

she had an opportunity to inspect it is a substantially significant factor. For example, the *Tesoriero* Court explained that it would be "highly skeptical of a subsequent claim that the chair was disposed of pursuant to a routine policy" if there were "any evidence that Tesoriero requested that the chair be preserved." *Id.* There was no evidence of that in *Tesoriero* and there is no evidence of it here. Therefore, the Undersigned sees no logical reason to reach a different result here on the bad faith issue.

Assuming that there was some evidence to support a bad faith finding (which there is not), then the next issues arising from Hoover's spoliation sanctions request would be to evaluate the practical importance of the evidence and to determine whether the alterations to the stairs significantly impaired Hoover's ability to prove her case. The Undersigned finds that she has not cleared those hurdles.

First, there is closed-circuit video footage showing Hoover's fall down the steps on the stairway, so the jury can understand how and why she fell.

Second, her expert was still able to reach conclusions about the cause of the fall.

For these reasons, the Undersigned **denies** Hoover's request for spoliation sanctions concerning the repairs/remediation to the stairs.

> d. <u>The Written Communications</u>
>
> > i. *(If **ESI** Had Been in NCL's Possession)*

The first issue is whether NCL ever had ESI in its possession. Hoover has not established this. He theory is premised on what NCL says is an incorrect hypothesis: that

NCL was making the decisions about the stairs during construction and/or was approving decisions made by architects and designers. But the evidence does not support that view, which, on balance, appears to be solely speculation. As NCL explained, it retained another company to handle the day-to-day supervision of the ship construction project.

Hoover argues that it is illogical to believe that NCL would not have been in possession of the staircase construction communications. But the Undersigned is not prepared to simply *assume* that NCL possessed (and then destroyed) this ESI.

In addition, Hoover has also not established the second prerequisite: that the ESI should have been preserved in the anticipation of litigation. If NCL had at one time possessed the stairway design approval ESI, then Hoover has not proven that NCL had a duty to preserve it. If NCL was unaware of Hoover's claim whenever it purportedly deleted or destroyed the ESI because the ESI was lost before she fell, then there would be no anticipation of litigation.

Moreover, to the extent that Hoover is asking for a default or a presumption of an adverse inference jury instruction because of the allegedly destroyed ESI communications, she has not established Rule 37(e)'s equivalent of bad faith: "only upon a finding that the party acted with **intent to deprive** another party of the information's use in the litigation." Fed. R. Civ. P. 37(e) (emphasis added). The same reasons why Hoover did not meet the common law bad faith requirement apply here, to the rule-based

issue of whether NCL had the "intent to deprive" her of the ESI's use.

    *ii.  If the Communications Were Not ESI*

Hoover's dilemma here (for missing or lost non-ESI communications) is the same as her predicament if the communications were in fact ESI: demonstrating that NCL had such communications in its possession. She has not established that. And, even if she had, Hoover has not established the common law fad faith she needs to demonstrate in order to obtain any type of spoliation sanction.

In addition, Hoover also failed to demonstrate the crucial nature of the communications and that she has been prejudiced.

In conclusion, for the reasons outlined above, the Undersigned **denies** Hoover's request for spoliation sanctions. Nevertheless, Hoover will be entitled to pre-repair photographs of the staircase in question regardless of her lack of success on the spoliation sanctions motion.

## III.    NCL's Work Product Claim Over Photographs

Factual work product may be subject to discovery upon the showing of a "substantial need" and the inability to obtain substantially equivalent evidence by other means without undue hardship. *See Burrow v. Forjas Taurus S.A.*, 334 F. Supp. 3d 1222, 1229 (S.D. Fla. 2018). "A non-exhaustive list of factors are assessed in determining substantial need including: (1) the importance of the materials to the party seeking them for case preparation, (2) the difficulty the party will have obtaining them by other means,

and (3) the likelihood that the party, even if he obtains the information by independent means, will not have the substantial equivalent of the documents he seeks." *Id.* at 1230 (citing Fed. R. Civ. P. 26 advisory committee's note to 1970 amendment).

Because the stairs in question are no longer in the same condition as they were when Hoover fell on them, and because Hoover does not have photographs of the stairs in question before they were repaired, she has a substantial need for them. She cannot acquire the pre-repair photographs from anyone except NCL and her expert advised that he could not perform the coefficient of friction test on the anti-skid slip portion of the stairs. Therefore, she has established the exception and NCL must, within five business days, produce to her all pre-repair photographs of the stairs which it has in its possession, custody, or control. *See Holladay v. Royal Caribbean Cruises, Ltd.*, 333 F.R.D. 588, 592-94 (S.D. Fla. 2019) (ordering cruise ship operator to produce to an injured passenger a defense-procured engineering report otherwise covered by the work product doctrine because the operator had dismantled an on-board jumping attraction involving a trampoline and plaintiff's expert did not have adequate access to all the parts and equipment).

It appears as though NCL has at least one pre-repair photograph, but it may possess more. It need not produce post-repair photographs as Hoover's expert was able to take post-repair photographs. *See id.*; *see also Burrow*, 334 F. Supp. 3d at 1229.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on August 5, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>Copies furnished to</u>:
The Honorable Marcia G. Cooke
All counsel of record